**SO ORDERED.**

**SIGNED this 11 day of December, 2013.**

$\hspace{6cm}$ _Stephani A. Humrickhouse_
$\hspace{7cm}$ **Stephani W. Humrickhouse**
$\hspace{7cm}$ **United States Bankruptcy Judge**

___

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| IN RE: | CASE NO. |
| CROC, LLC, | 13-05146-8-SWH |
| DEBTOR | |

**ORDER ALLOWING MOTION TO CONVERT OR DISMISS**

This matter came before the court on motion of the bankruptcy administrator to convert or dismiss this chapter 11 case for cause pursuant to 11 U.S.C. § 1112(b)(4). Memoranda supportive of the bankruptcy administrator's motion were filed by creditors SRS, North Carolina Property, LLC ("SRS") and Stephen R. Smith ("Smith"), Donald Wray ("Wray"), and EOS Properties, LLC ("EOS"). The debtor objects to the motion. Hearings on the motion took place on October 17 and November 7, 2013, in Raleigh, North Carolina, after which the court afforded the parties an additional opportunity to file supplemental memoranda. The matter is now ripe for disposition, and for the reasons that follow, the court will convert the case for cause pursuant to § 1112(b)(4).

**BACKGROUND**

The debtor is a beach condominium unit rental business with two employees; the debtor's owner-operator, Glenn Magill ("Magill"), and his son, who lived in one of the condo units (through October 2013) as the on-site manager. The debtor owns a total of twelve condominium units within

the Bodie Island Resort, located in Nags Head, North Carolina. Though the usage allocations change from time-to-time, at present, eight of the condos are designated as long-term rentals and four are used for short-term vacation rental. The debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on August 15, 2013.

On August 29 and September 12, 2013, Magill testified for the debtor at an emergency hearing for the use of cash collateral. In response to and consequence of Magill's testimony, the Bankruptcy Administrator ("BA") moved to dismiss or convert the debtor's case for cause under multiple provisions of § 1112(b)(4): specifically, the BA urges conversion or dismissal on four separate grounds; the likelihood of substantial and continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; gross mismanagement of the estate; the debtor's failure to maintain appropriate insurance; and the debtor's post-petition payments for debts or services rendered pre-petition. SRS, Smith, Wray and EOS filed memoranda supporting the BA's motion to convert or dismiss. Creditor EOS also filed a memorandum outlining the specific bases upon which it contends the debtor's case should be converted to Chapter 7.

In addition, the memoranda filed by the BA and other creditors assert their collective belief that the debtor's plan is not feasible. The debtor filed a plan on November 13, 2013, which attempted to address its creditors' efforts to preclude cramdown, but developments since that filing

indicate that the debtor is unlikely to succeed with its effort[1] to include an impaired accepting class. In light of the court's determination that cause exists to convert the case, the court need not address the feasibility of the debtor's plan.

**I.      Grounds to Convert or Dismiss Pursuant to 11 U.S.C. § 1112(b)(4)**

      A.      <u>Diminution of Estate and Absence of Likelihood of Rehabilitation</u>

Among the statutory grounds providing cause for conversion or dismissal is the "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The BA contends that dismissal on this ground is warranted by at least three factual bases: First, the testimony of Jack Lightbody, a real estate witness, that "the property is in a diminished state and in need of immediate attention, metal is rusting, stucco has water damage, only one pool is in operation, buildings need new paint, a crack in the pool needs to be sealed, the entrance sign needs to be replaced, property is in general disrepair and overall not aesthetically pleasing." BA's Mem. in Support of Mot. to Dismiss or Convert ("BA's Mem.") at ¶ 1(a). Next, the BA argues that the debtor "does not generate enough income to satisfy debts and pay for expenses including homeowner's dues and assessments associated with the property." <u>Id.</u> Finally, the BA notes that the debtor, as the owner of 12 units, has "failed to pay the homeowner's association for past dues and/or assessments, which has resulted in the property falling into disrepair and caused a hardship on the homeowner's association." <u>Id.</u> At the hearing on November 4, 2013, Mike Milam, chairman of the finance committee of the Bodie Island

---

[1] At one point, the debtor thought that secured creditor Donald Wray might vote in favor of the debtor's plan, but Wray is in support of dismissal or conversion. The debtor then represented that creditor Jon T. Gonzales would be the sole impaired class voting in favor of the debtor's plan, but the Gonzales claim is now assigned to creditor EOS.

Homeowners Association ("HOA"), testified that the debtor had not made payment to the HOA since June 2012, for 2012 dues. Milam estimated the debtor's dues shortfall to be approximately $40,000, which he characterized as a hardship that impacts the HOA's ability to provide maintenance services.

In response, the debtor did not address testimony regarding the physical condition of the property in any detail, except to state that there is "no evidence that the property is declining in value" and that "the property is being properly maintained." Debtor's Resp. to BA's Mot. at 6-7. The debtor notes of its relationship with the HOA that "the Debtor and the HOA are in conflict with each other," which the debtor attributes in part to the HOA's lack of cooperation in producing evidence of insurance (discussed below). There are, however, other areas of conflict as well, as illustrated by the debtor's objection to the HOA's claim of $75,855.20, and its assertion that it holds an offsetting claim of $174,554.53, as well as certain statutes of limitation defenses which will, the debtor states, warrant disallowance in full of the HOA claim.

Beyond those points, the testimonial evidence and filings are (comparatively) sparse with regard to whether there is a literal, physical component to any loss to or diminution of the estate. The court recognizes that the BA's concerns under § 1112(b)(4)(A) go beyond the physical condition of the property, but the court believes those concerns fit more comfortably into the context of gross mismanagement, discussed below. Accordingly, based on the limited testimony of the HOA representative and the debtor's skimpy response, the court concludes only that the property of the estate is in less than optimal condition. The court does not at this time believe that failures of maintenance and upkeep rise to the level of "substantial or continuing loss or diminution."

B.      Gross Mismanagement of the Estate

The court shall convert or dismiss a case if the court finds "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). The BA asserts that the debtor's varying testimony over three hearings (on the motion to dismiss and the motion to use cash collateral) establishes his general lack of familiarity with, and understanding of,[2] the debtor's income and expenses. In addition, by the BA's calculations, information provided by Magill with respect to the nature of the leases[3] (month-to-month, long or short term, etc.) results in monthly collections of $5,900 in long-term rent money. In contrast, the BA says, the projections advanced by the debtor at the hearing predict collections of $8,400 per month at full capacity. BA's Mem. at ¶ 1(b).

The debtor responded with two memoranda, the affidavit of Magill, and a collection of documents in support of the affidavit, including utility bills and portions of the HOA's insurance policy. The court thoroughly reviewed all of the testimony and documentation offered in opposition to the motion. The court concludes that these sources, taken together, establish the debtor's managerial shortcomings to be so extensive and pervasive that conversion or dismissal is necessary based on § 1112(b)(4)(B) alone.

---

[2] Magill's testimony with respect to the number of units that were short-term as opposed to long-term rentals differed from one hearing to the next, and that factual discrepancy was among several factors initially cited by the BA as catalysts for her concerns about mismanagement of the estate. Magill subsequently explained in his memorandum that at the time of the first hearing, there were five vacation and six long-term rentals; during the short period of time between that hearing and the next, he re-designated a vacation rental as long-term, such that there was no inconsistency, but rather a change. The court accepts this explanation as plausible.

[3] The BA clarifies further that the debtor did not provide to the BA the lease agreement for Unit 301, that the lease agreement for Unit 310 was set to expire on 11/30/13, and that there is no current lease agreement that the BA knows of for Unit 102, which was occupied by Magill's son.

The debtor's own testimony reflects a wholly inappropriate fluidity between the debtor and Bodie Island LLC, which is another entity held solely by Magill. The details are unclear, but it is evident that the Bodie Island entity is used (at least in part, and at least sometimes) to receive the debtor's rents and deposits, and then pay those receivables out to Magill (and, perhaps, others). See Magill Aff. ¶ 5; see also Magill Aff. Ex. F p. 3 (indicating the debtor's cash on hand, with a portion attributable to "BI"); Ex. F p. 4 (entitled "Exhibit B" and allocating the debtor's vacation rental income to both the debtor and to Bodie Island LLC). Compounding the obvious problems inherent in this sort of arrangement is the fact that "most" of the debtor's long term tenants (it is unclear how many) do not have checking accounts, according to Magill. These tenants pay monthly rent, in amounts ranging from $1,000 to $1,200, in cash. Given these longstanding financial ambiguities, there are so very few solid, verifiable benchmarks – financial, operational, or otherwise – to go by that even the task of establishing where to *start* in pinpointing the exact nature of the debtor's business difficulties is, in itself, difficult. The court does not believe the debtor intended for its business practices to be virtually indecipherable, but suspects that to Magill's way of thinking, the debtor's current system "works" if one is fully immersed in its quirks and vagaries. This approach, however, clearly did *not* work prior to bankruptcy, and cannot be maintained going forward.

On this same note, a review of the utility bills appended to Magill's affidavit shows that out of bills for seven of the twelve units, four bills (for units 101, 102, 303, and 304) identify the customer as Croc LLC; three others (units 103, 301, and 305) list the customer as Glenn E. Magill, Jr. Magill Aff. ¶ 7, Ex. I. Did the debtor pay utility bills that were not even its own debts to pay, and were instead the debts of Magill? So it appears, although again, the debtor's lack of bookkeeping and accounting standards raises doubts. What is abundantly clear is that the debtor

does not grasp the significance of Croc, LLC operating as a distinct business entity, and an entity in bankruptcy, at that.[4]

These utility bills were included by the debtor in response to the BA's contention that the debtor "made post-petition payments for debts and/or services rendered pre-petition." Magill explained that the bills were due on September 30, 2013, and that he paid them because he "believed that I needed to pay those bills to keep the electricity running for the condominium units and that those expenses were ordinary and necessary business expenses." Magill Aff. ¶ 7. Every utility bill includes a past due amount and an indication that a percentage of the past due amount was paid during the preceding month.[5] Aside from the clear indication that the bills were paid for pre-petition debt and/or services, these bills reflect the debtor's month-to-month struggle simply to maintain electrical service to the units.

These difficulties notwithstanding, Magill's affidavit and the debtor's forecasts together paint an optimistic picture of the debtor's expected income and expenses going forward. These projections, however, have no stated and assessable bases. The debtor states that it will raise all rents in 2014, yet articulated no rationale for expecting success in doing so. The debtor's "2014

---

[4] The debtor filed a motion on September 4, 2013, for authorization to refund certain deposits received by it for vacations that were subsequently cancelled, but as creditor EOS and the BA then noted in objections filed on September 23, 2013, it appears that those monies – as well as others – were in fact received by Bodie Island LLC. See Magill Aff. Ex. F p. 4 (entitled Exhibit B and listing vacation rental income, allocated to both the debtor and to Bodie Island LLC, and deducting McFadden deposit of $670.50 from Bodie Island).

[5] Except for Unit 301, as to which no previous (September 5) payment was made. The bill for Unit 301 differs from the others in that it includes no usage history prior to September, though it does include a previous amount due of $102.55, plus a "deposit installment" of $75 and usage charges for September, totaling $348.51. The amount was billed to Magill, not to Croc, LLC. Unit 301 is the unit for which Magill accepted a discounted rate of $800 per month because "the air conditioning did not work."

7

Projected Condo expenses" omits reference to its legal fees, tax obligations other than occupancy taxes, management fees, and credit card fees. It also stipulates that long-term tenants pay their own electric bills even though the bills appended to the affidavit included at least one bill for a unit designated by the debtor as long-term.[6]

Going forward, the debtor estimated housekeeping fees for four vacation units at $180 a month, or $2,160 a year. Magill Aff. Ex. H. However, the debtor's profit and loss statement for the two weeks of August 16-31, 2013 reflects a housekeeping cost of $540. Magill Aff. Ex. F p. 12. Another accounting of receipts and expenses, this for the period of August 28 to September 12, 2013, lists housekeeping costs ($60 per clean) at $1,080. Magill Aff. Ex. A. The accounting for the following two-week period, September 15 to 30, 2013, sets out two weeks' worth of housekeeping expenses at $840. Magill Aff. Ex. B. And, the accounting for the four week period after that, October 1 to 31, 2013, sets out four weeks' worth of housekeeping expenses at $1,200. Magill Aff. Ex. C. So, on the one hand, the debtor's operating budgets for a total of eight weeks reflect actual costs of $3,120 for housekeeping, or a total of $3,680 for ten weeks if the slightly overlapping period of August 16-31 is included. Then, on the other hand, there is the debtor's forecast of $180 per month in housekeeping fees for 2014. The numbers cannot be reconciled or explained, even though these are the accountings prepared for use in this bankruptcy case, where accuracy and verifiability are paramount.[7]

---

[6] The debtor paid utility bills on September 8 for units including Unit 301, a long-term unit. The debtor's payment for two other long-term units may reflect their former status as a short-term rental (Unit 101) and as Magill's son's unit (Unit 102).

[7] The court understands and has considered the seasonal nature of the debtor's business which impacts the consistency of the need for housekeeping. Notwithstanding that, the debtor has not offered a verifiable basis for its projections.

The court is not unsympathetic to the difficulties of operating a residential rental business. Magill's efforts to keep many balls in the air and his evident flexibility and creativity in attempting to achieve the highest and best use of the properties (long-term, short-term, payment options, etc.) are useful, laudable traits. However, they do not carry the day in the face of creditors' legitimate competing interests, and against the overwhelming and compelling evidence that the business of the debtor is grossly mismanaged. The debtor's method of doing business over the past years renders it utterly unable to provide for its creditors and the court a clear, understandable, and transparent accounting of its use of cash and receipts, and for its outlays for expenditures. The court will convert this case to a case under Chapter 7 based upon the debtor's gross mismanagement of the estate within the meaning of § 1112(b)(4)(B), which will afford a trustee the opportunity to unravel and make sense of the debtor's finances.

    C.    <u>Failure to Maintain Appropriate Insurance</u>

Cause to dismiss or convert exists upon a debtor's "failure to maintain appropriate insurance that poses a risk to the estate or to the public." 11 U.S.C. § 1112(b)(4)(C). The BA contends, and the debtor does not contest, that the only insurance policy currently in effect on the properties is held by Bodie Island Resorts, which is the homeowners' association ("HOA"). The BA maintains that there is no general liability policy in the name of the debtor. The chairman of the HOA's finance committee, Mark Milam, testified that the insurance policy maintained by the resort covers only the common areas of the complex and outside structures. Further, he testified that "most if not all current homeowners maintain separate general liability policies." BA's Mem. at ¶ 1(c).

The debtor acknowledges in response that he has "had some challenges in producing the Declarations for the insurance policies," but states that insurance has been in place since the filing

9

of the petition. According to the debtor, the policies "are in the name of the HOA." Debtor's Response at 3. In his affidavit, Magill responds to the BA's contention that the debtor has no general liability insurance on the property by stating that "[i]n reference to insurance, attached as EXHIBIT D are documents evidencing casualty and liability insurance." Magill Aff. at ¶ 9. The documents included in Exhibit D are portions of policies maintained by the HOA.

It appears that there is no general liability policy on the property, that there is no insurance policy in the name of the debtor, and that the debtor is unaware of these facts and the significance of them. Magill appears to believe that the HOA's insurance policy is to the debtor's benefit, which is all the more incongruous given the debtor's ongoing dispute with the HOA and failure to pay the dues owing to it. The court concludes that the debtor's property lacks appropriate insurance and, on that ground alone, sufficient cause exists to convert or dismiss.

        D.       <u>Failure to Satisfy Reporting Requirements</u>

Finally, the BA argues that cause to convert or dismiss exists under 11 U.S.C. § 1112(b)(4)(F), which provides that 'cause' includes a debtor's "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." Specifically, the BA cites the debtor's testimony of October 17, 2013, that there are three professionals "currently working on the debtor's behalf," including special counsel for the debtor, a real estate agent, and an accountant. BA's Mem. at ¶ 1(d). However, the BA notes, that the debtor did not file an application seeking to employ special counsel until October 25, 2013; further, the BA notes, as of November 11, 2013 (the date on which the BA filed the supplement to the motion to convert or dismiss), neither the real estate agent nor the accountant had been

10

employed, despite the BA's request at the September 11, 2013 hearing for the use of cash collateral. Finally, the BA states that the debtor failed to file federal income tax returns for 2011 or 2012.

In response, the debtor states in his affidavit, with respect to records, that "I am properly maintaining books and records for the Debtor." Magill Aff. ¶ 11. The debtor filed a motion to employ Hersey C. Quinn as accountant on October 21, 2013, which was allowed without objection on November 18, 2013. At the hearing on October 17, 2013, the debtor testified that Mr. Quinn was "working on" the 2012 taxes and acknowledged that the 2011 taxes also had not been filed. The debtor applied to employ Phillip H. Hayes as special counsel on October 25, 2013, after testifying at the hearing on October 17, 2013, that Mr. Hayes already was acting as its attorney, was working on a lawsuit against creditors EOS, SRS and Smith, and was owed $5,000. The debtor applied on November 12, 2013 to employ Geraldine J. Holcomb of Coldwell Banker Seaside Realty, after testifying at the hearing on October 17 that Ms. Holcomb was the debtor's realtor. As for unfiled taxes, Magill testified that the debtor did not list the IRS as a creditor, does not owe any federal taxes, and is not in default. The recently filed plan and disclosure statement do include IRS and NC Department of Revenue tax claims as part of an unimpaired Class 3, but indicates that these entities do not have claims.

In light of all the above, the court concludes that the debtor's approach to filing requirements, whether imposed as part of bankruptcy procedure or federal tax law, is consistent with other managerial practices in that the debtor either does not understand or lacks the proper regard for requirements that actually apply to it. In the court's view, the odds of the debtor's tax obligations to the federal and state governments simply zeroing out are, in all probability, zero. Thus it remains uncertain whether the debtor will have additional claims to contend with or should

instead expect a refund of tax overpayment. These reporting failures add to the court's certainty that conversion of the case is appropriate.

## II.     Conversion on Grounds of Lack of Feasibility or Confirmability

In light of the court's conclusion that the BA and secured creditors have established ample bases for conversion or dismissal, and that conversion is in the best interest of creditors, there is no reason to discuss additional and alternative grounds for conversion.

## CONCLUSION

The BA has established ample cause to dismiss or convert within the meaning of 11 U.S.C. § 1112(b)(4)(B), and also, separately and independently, under 11 U.S.C. § 1112(b)(4)(C). The court's consideration of factors set out in §§ 1112(b)(4)(A) and (F) also support conversion or dismissal, though they would not independently require either action. This case cannot proceed under the ill-fitting auspices of a Chapter 11 plan, and the interests of the creditors and the estate are best served by conversion of the case to a liquidation under Chapter 7 so that the financial affairs of the debtor can be properly sorted.

For the foregoing reasons, the debtor's Chapter 11 case is hereby **CONVERTED** to a case under Chapter 7.

**SO ORDERED**.

## END OF DOCUMENT